## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **THOMAS BLAISE,** | : | **CIVIL NO.  3:12-CV-2298** |
| | : | |
| **Plaintiff** | : | **(Judge Munley)** |
| | : | |
| **v.** | : | |
| | : | |
| **DAVID J. EBBERT, WARDEN,** *et al.*, | : | |
| | : | |
| **Defendants** | : | |

::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::

## MEMORANDUM

Plaintiff Thomas Blaise ("Blaise"), a federal inmate currently incarcerated at the

Federal Prison Camp at the United States Penitentiary at Canaan ("USP-Canaan"), Waymart,

Pennsylvania, commenced this Bivens[1] action on November 19, 2012.  The matter is

proceeding *via* an amended complaint (Doc. 33), wherein plaintiff alleges that the following

individual defendants violated his Eighth Amendment right to adequate medical care:  David

J. Ebbert, A. Dunbar, D. Holloway, B. Sullivan (also listed on the docket as Barb Sullivan),

T. Horeis, K. Kaiser, S. Tucker, J. Vander Hey-Wright, N. DeRoberto, and D. Cook.

Presently pending is defendants' motion (Doc. 54) to dismiss or, in the alternative, for

summary judgment.  (Doc. 54).  For the reasons that follow, the motion for summary

judgment will be granted.

---

[1]Bivens v. Six Unknown Named Agents of the Fed. Bureau of Narcotics, 403 U.S. 388 (1971).  Bivens stands for the proposition that "a citizen suffering a compensable injury to a constitutionally protected interest could invoke the general federal-question jurisdiction of the district courts to obtain an award of monetary damages against the responsible federal official."  Butz v. Economou, 438 U.S. 478, 504 (1978).

I.      **Standard of Review**

Through summary adjudication the court may dispose of those claims that do not present a "genuine issue as to any material fact" and for which a jury trial would be an empty and unnecessary formality.  See FED. R. CIV. P. 56(c).  The burden of proof is upon the non-moving party to come forth with "affirmative evidence, beyond the allegations of the pleadings," in support of its right to relief. Pappas v. City of Lebanon, 331 F. Supp. 2d 311, 315 (M.D. Pa. 2004); FED. R. CIV. P. 56(e); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).  "'The non-moving party may not simply sit back and rest on the allegations in the complaint; instead, it must "go beyond the pleadings and by [its] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, and designate specific facts showing that there is a genuine issue for trial.' Celotex [ ], 477 U.S. [ ] 324 [ ] (1986) (internal quotations omitted)." Schiazza v. Zoning Hearing Bd., Fairview Twp., York County, Pa, 168 F. Supp. 2d 361, 365 (M.D. Pa. 2001).  This evidence must be adequate, as a matter of law, to sustain a judgment in favor of the non-moving party on the claims.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250-57 (1986); Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587-89 (1986); see also FED. R. CIV. P. 56(c), (e).  Only if this threshold is met may the cause of action proceed.  Pappas, 331 F. Supp. 2d at 315.

II.     **Statement of Material Facts**

"A motion for summary judgment filed pursuant to FED. R. CIV. P. 56 shall be accompanied by a separate, short and concise statement of the material facts . . . as to which the moving party contends there is no genuine issue to be tried." See L.R. 56.1.  The

opposing party shall file a separate statement of the material facts as to which it is contended that there exists a genuine issue to be tried.  Id.  "All material facts set forth in the statement required to be served by the moving party will be deemed to be admitted unless controverted by the statement required to be served by the opposing party."  Id.  Because Blaise failed to oppose defendants' statement of material facts, despite being ordered to do so (Doc. 60),  all facts contained therein are deemed admitted.

Blaise brings Bivens claims against defendants by alleging deliberate indifference to his medical needs with regard to medical care and treatment for a knee injury.  (Doc. 55. ¶ 4). He alleges that defendants, as members of the Utilization Review Committee ("URC") at USP Canaan, and the "Regional Director," "denied his request for knee surgery."  (Id.)

Blaise claims that in April 2009, after he injured his left knee while playing basketball, he sought medical services.  (Id. at ¶ 5).  He was treated and x-rays were taken of his knee. (Id.)

 Eighteen months later, after receiving an MRI of his knee, Blaise alleges that he was seen by an orthopedic surgeon, who told him that he had injured his ACL in his left knee and that surgery "was the only way of correction [sic] the ALC [sic] or that [he] will suffer further consequences. . . ."  (Id. at ¶ 6, citing Doc. 33, pp. 2-3).  He alleges that he discovered that the Federal Bureau of Prisons ("BOP") denied the request for surgery in February 2011 "because the Utilization Review Committee (URC) did not f[i]nd the surgery necessary." (Id. at ¶ 7, citing Doc. 33, pp. 3, 4).  However, he acknowledges that the BOP recommended he "go to sickcall every time that he feels pain" and "gave [him] painkillers."  (Id., citing Doc. 33, pp. 2, 5).  He alleges that because BOP policy categorizes his knee injury as

"medically necessary, non-emergent," the surgery should be considered "medically necessary," and failure to provide it violates the Eighth Amendment.  (Id. at ¶ 8, citing Doc. 33, p. 4).

The following medical history is derived from the BOP's Electronic Medical Records system (BEMR) and represents a complete summary of Blaise's contact with Health Services staff regarding his left knee injury.  (Id. at ¶ 9).

Blaise was first seen for a knee injury on May 5, 2009, at which time he informed Health Services staff that he injured his knee while playing basketball.  (Id. at ¶ 11).  Medical staff evaluated Blaise's knee, prescribed him Naproxen in 500mg doses, and instructed him to return to sick call if his condition did not improve.  (Id.)

He returned to Health Services on May 24, 2009, complaining of a new knee injury he suffered while playing basketball the prior day, despite his earlier knee injury.  (Id. at ¶ 12). Medical staff again examined his knee, instructed Blaise to ice the affected area, and supplied him with an Ace wrap.  (Id.)

On May 26, 2009, Blaise returned with complaints of knee pain, but denied that his knee was "locking or giving out."  (Id. at ¶ 13).  After the examination, medical staff prescribed him with Indomethacin capsules in 50 mg doses and ordered an X-ray. (Id.) Blaise declined crutches.  (Id.)

A June 3, 2009 radiology report indicated that the x-ray results were negative.  (Id. at ¶ 14).  A few months later, on August 20, 2009, Blaise returned to Health Services complaining of knee pain. (Id. at ¶ 15).  Medical staff ordered an MRI and specifically

4

instructed Blaise to not "play strenuous sports until MRI done." (Id.)  After another period of several months, on December 3, 2009, Blaise visited Health Services with various ailments, including lightheadedness, popping in his right shoulder, and some continued pain in his left knee.  (Id. at ¶ 16).  Among other things, medical staff prescribed piroxicam in 20 mg doses for the knee pain, provided him with a knee brace and ordered that he be confined to his living quarters with only certain exceptions.  (Id.)

Blaise came to sick call on March 5, 2010, complaining of left knee pain and reported that the knee "occasionally swells with activity causing him pain." (Id. at ¶ 17).  He complained that the knee brace caused "skin irritation." (Id.)  Staff prescribed him indomethacin in 50mg doses and provided Blaise with two additional Ace wraps.  (Id.)

On April 12, 2010, Blaise reported continued knee pain to medical staff.  (Id. at ¶ 18). He reported that he experienced discomfort in his knee "from certain movements or when stepping in dips in the pavement or on the track." (Id.)  Although his knee was tender, he had a full range of motion and no swelling. (Id.)  Noting that Blaise was still scheduled for an MRI, medical staff instructed him to continue with stretching exercises.  (Id.)  He sought medical care again on April 22, 2010, reporting left ear discomfort and an incident where his left knee gave out while working.  (Id. at ¶ 19).  The examination of the knee revealed a full range of motion and no swelling.  (Id.)

On May 11, 2010, Blaise received an MRI examination of his left knee which revealed that he likely suffered from a chronic anterior cruciate ligament (ACL) tear.  (Id. at ¶ 20).  Medical staff provided him with a copy of his MRI results on May 27, 2010.  (Id. at ¶

21).  The next day, May 28, 2010, staff requested an orthopedic consultation for the knee,

and again prescribed indomethacin for the injury. (<u>Id.</u> at ¶ 22).

Blaise returned to sick call on July 12, 2010, where staff noted that he had a suspected

ACL tear in his left knee and counseled him regarding his plan of care, including follow-up

at sick call as needed.  (<u>Id.</u> at ¶ 23).  While an examination revealed tenderness, Blaise had

full range of motion and no swelling.  (<u>Id.</u>)  He was told that an orthopedic consult was

pending.  (<u>Id.</u> at ¶ 24).

Blaise was seen by an orthopedist, Dr. Jeffrey Mogerman, on January 29, 2011.  (<u>Id.</u>)

The orthopedist concluded that Blaise suffered from an ACL insufficiency and recommended

that he be scheduled for arthroscopic surgery to reconstruct the ACL.  (<u>Id.</u>)  On February 7,

2011, medical staff filed the orthopedic surgery request for Blaise.  (<u>Id.</u> at ¶25).

During a visit to Health Services on August 1, 2011, Blaise asked to switch back to a

previous pain medication (indocin) for knee pain; medical staff prescribed the indomethacin.

(<u>Id.</u> at ¶ 26).

On or around September 28, 2011, the URC at USP Canaan reviewed the request for

Blaise's knee surgery, and it was noted that it did "not meet the medical criteria as

determined by the Regional Medical Director and is deferred at this time."  (Id. at ¶ 27).

Blaise returned to Health Services with various ailments on October 6, 2011,

including chronic low back pain, and knee pain.  (<u>Id.</u> at ¶ 28).  Medical staff prescribed

indomethacin and scheduled a follow-up examination in six months.  (<u>Id.</u>)

He next sought treatment for various ailments, including knee pain and abdominal

pain, on February 21, 2012. (Id. at ¶ 29). He was counseled, and medical staff communicated the plan of care. (Id.)

He returned to Health Services on August 17, 2012, which noted that he had chronic low back pain and the history of a torn ACL. (Id. at ¶ 30). After assessing Blaise, staff prescribed indomethacin and entered a new orthopedic consultation request. (Id.) Due to his continuing knee problems, BOP medical staff also scheduled a physical therapy consultation on December 6, 2012, noting that he needed "eval and tx prior to ortho surgery submission." (Id. at ¶ 30).

Immediately after Blaise expressed concern about his continuing pain and after BOP medical staff submitted the requests for consults with an orthopedist and physical therapist, staff observed Blaise running on a treadmill for several minutes without any pain or difficulty. (Id. at ¶ 32). When confronted, Blaise said he was "only running for 2 minutes." (Id.)

BOP Program Statement 6031.01, Patient Care (January 2005) "required every institution, including USP Canaan, to have an established Utilization Review Committee (URC), which was chaired by the Clinical Director." (Id. at ¶ 41). "URC members should include, but were not limited to, the HSA or Assistant HSA; the Medical Trip Coordinator; the Health care provider(s) directly involved in the reviewed cases; the Director of Nursing (if applicable); and a chaplain or social worker." (Id. at ¶ 42). "[T]he URC was required to review the following areas: outside medical, surgical, and dental procedures; requests for specialist evaluations, in-house or escorted trips to the specialist's office

(approved by the Clinical Director); requests for "Limited Medical Value" treatments/

procedures (approved by the Clinical Director); retrospective review of all cases sent to the

community hospital during hours when no health care provider was on duty at the institution;

case considerations for extraordinary care; concurrent review of inpatients at community

hospital (monitoring length of stay and interventions); and other services the primary care

provider or the Clinical Director have recommended."  (Id. at ¶ 43).  "Following a review of

each case, the URC was required to select one of the following:  approve the request without

modification; refer the inmate for further evaluation to a staff physician; refer the inmate for

further evaluation to a specialty consultant; put the inmate on a waiting list, with

recommended parameters as to the length of time the procedure may be delayed without

increasing the risk of additional morbidity; determine that the procedure is contraindicated,

due to unacceptable risk to the inmate if it is performed; or deny the request for

the procedure."  (Id. at ¶ 44).  "As chair of the committee, the Clinical Director is the final

authority for all URC decisions."  (Id. at ¶ 45).

P.S. 6031.01 "defined five levels of care provided to inmates: Medically Necessary -

Acute or Emergent; Medically Necessary - Non-Emergent; Medically Acceptable - Not

Always Necessary; Limited Medical Value; and Extraordinary."  (Id. at ¶ 46).  "Care that

was 'Medically Acceptable - Not Always Necessary' was defined as medical conditions that

are considered elective procedures when treatment may improve the inmate's quality of life."

(Id. at ¶ 47).  "Relevant examples in this category include, but are not limited to: joint

replacement; reconstruction of the [ACL] of the knee; and treatment of non-cancerous skin

conditions (e.g. skin tags -- lipomas)." (Id.)  "[T]he Clinical Director could request a secondary review for treatments or procedures in the categories of "Medically Acceptable - Not Always Necessary" and "Limited Medical Value" on a case-by-case basis through the regional Clinical Specialty Consultants or a Central Office physician." (Id. at ¶ 48).

"The BOP issued Clinical Practice Guidelines for the Management of Anterior Cruciate Ligament injuries in June 2011."  (Id. at ¶ 49).  "Per these guidelines, the two most common presentations of ACL injuries in the BOP are the acute knee injury and the more chronic ACL deficient knee from a pre-existing ACL injury." (Id. at ¶ 50).  "Treatment of each kind of ACL injury differs."  (Id. at ¶ 51).  "The Guidelines state there is general consensus that surgical intervention is indicated for complex knee injuries involving certain fractures or multiple torn ligaments and/or cartilage, and for those with physically demanding occupations or high-level athletes with a need to return to sports participation." (Id. at ¶ 52). "However, for the majority of other ACL injuries, the goal of treatment is functional stability, *i.e.*, the ability to perform the basic activities of normal daily life and work, without recurrent episodes of knee instability." (Id. at ¶ 53).  "The Guidelines further state that studies indicate that a formal physical rehabilitation program without surgery can achieve that goal for up to two-thirds of these patients." (Id. at ¶ 54).  "The Clinical practice Guidelines state that management of acute ACL injuries includes the standard RICE regimen (Rest, Ice, Compression, and Elevation) and over-the-counter medication for pain." (Id. at ¶ 55).  "More complicated injuries or severe pain may require prescription analgesics." (Id. at ¶ 56).  "The 'rest' component of management should include modifications and/or

restrictions to activities, bunk assignment, and work responsibilities, as clinically indicated." (Id. at ¶ 57). "Specific restrictions should include, but are not limited to, no climbing or work at heights, no squatting, and no heavy lifting greater than about 25 pounds." (Id. at ¶ 58). "The inmate should avoid participation in sports, including jogging or running." (Id. at ¶ 59). "Initially, issuing crutches for non-weight bearing or partial weight bearing as tolerated on the affected leg is appropriate." (Id. at ¶ 60).

"In the early stages fol1owing acute ACL injury, physical therapy and rehabilitation of the knee is focused on maintaining range of motion in the injured knee, which is accomplished by the inmate through a simple self-directed home exercise program." (Id. at ¶ 61). "Unless there are multiple or complicated injuries to other structures, early or urgent surgical repair of the torn ACL usually is not indicated and may result in a higher incidence of joint fibrosis." (Id. at ¶ 62).

Defendant Sullivan was a member of the URC that considered Blaise's request for knee surgery. (Id. at ¶ 63). "Per the Clinical Practice Guidelines, the URC recommended that Blaise's surgery consultation be forwarded to the Regional Medical Director for final review." (Id. at ¶ 64). "The USP Canaan Clinical Director followed that recommendation, and forwarded the consultation to the region for review." (Id. at ¶ 65).

On November 18, 2011, Nurse Practitioner Hyosim Seon-Spada performed an initial review of Blaise's request and determined it should be disapproved since his case did not meet BOP Clinical Practice Guidelines for ACL surgery. (Id. at ¶ 66). Seon-Spada consulted with the Regional Medical Director, who performed a secondary review of Mr.

Blaise's case.  (Id. at ¶ 67).  The Regional Medical Director disapproved Mr. Blaise's request

because it did not meet BOP ACL criteria.  (Id.  at ¶ 68).  It was specifically noted that "not

all chronic ACL tears require repair," and the "[m]edical record reveals lack of pertinent

exam findings."  (Id.)  This indicated that the ACL injury was not acute, and there was no

indication in the records that a RICE regimen and/or physical therapy occurred.  (Id.)

## III.   Discussion

For the delay or denial of medical care to rise to a violation of the Eighth

Amendment's prohibition against cruel and unusual punishment, a prisoner must demonstrate

"(1) that defendants were deliberately indifferent to [his] medical needs and (2) that those

needs were serious."  Rouse v. Plantier, 182 F.3d 192, 197 (3d Cir. 1999).  Deliberate

indifference requires proof that the official "knows of and disregards an excessive risk to

inmate health or safety."  Natale v. Camden Cnty. Corr. Facility, 318 F.3d 575, 582 (3d Cir.

2003) (quoting Farmer v. Brennan, 511 U.S. 825, 837 (1994)).  Deliberate indifference has

been found where a prison official:  "(1) knows of a prisoner's need for medical treatment

but intentionally refuses to provide it; (2) delays necessary medical treatment based on a

nonmedical reason; or (3) prevents a prisoner from receiving needed or recommended

treatment."  Rouse, 182 F.3d at 197.  Deference is given to prison medical authorities in the

diagnosis and treatment of patients, and courts "disavow any attempt to second-guess the

propriety or adequacy of a particular course of treatment . . . (which) remains a question of

sound professional judgment."  Inmates of Allegheny Cnty. Jail v. Pierce, 612 F.2d 754, 762

(3d Cir. 1979) (quoting Bowring v. Godwin, 551 F.2d 44, 48 (4th Cir. 1977)).  Allegations of

negligent treatment or medical malpractice do not trigger constitutional protections.  Estelle v. Gamble, 429 U.S. 97, 105–06 (1976).

It is well-settled that no claim of deliberate indifference is made out where a significant level of care has been provided, and all that is shown is that the prisoner disagrees with the professional judgment of a physician, or that a different physician has, in the past, taken a different approach to the prisoner's treatment.  Estelle, 429 U.S. at 105–06, 107 (finding that "in the medical context, . . . a complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment"); Parham v. Johnson, 126 F.3d 454, 458 n. 7 (3d Cir. 1997) (recognizing "well-established law in this and virtually every circuit that actions characterizable as medical malpractice do not rise to the level of 'deliberate indifference' "); Durmer v. O'Carroll, 991 F.2d 64, 67 (3d Cir. 1993) (same).  See also Taylor v. Norris, 36 F. App'x. 228, 229 (8th Cir. 2002) (finding that deliberate indifference claim failed because it involved a disagreement over recommended treatment for hernias and decision not to schedule a doctor's appointment); AbdulWadood v. Nathan, 91 F.3d 1023, 1024–35 (7th Cir. 1996) (holding that an inmate's disagreement with selection of medicine and therapy for sickle cell anemia falls well short of demonstrating deliberate indifference); Sherrer v. Stephen, 50 F.3d 496, 497 (8th Cir. 1994) (concluding that inmate's "desire for a replacement joint instead of fusion surgery is merely a disagreement with the course of medical treatment and does not state a constitutional claim");  Czajka v. Caspari, 995 F.2d 870, 871 (8th Cir. 1993) (inmate's mere disagreement with doctor's informed decision to

delay surgery does not establish Eighth Amendment claim).  "Certainly, no claim is

presented when a doctor disagrees with the professional judgment of another doctor. There

may, for example, be several ways to treat an illness." White v. Napoleon, 897 F.2d 103, 110

(3d Cir. 1990).

Viewing the evidence in the light most favorable to Blaise, he has failed to

demonstrate a genuine issue of material fact on the issue of deliberate indifference.  For

example, he has not presented any evidence to show that defendants recognized the need for

an x-ray or other diagnostic tests and then refused to order same.  Nor does he demonstrate

that he was denied pain or other medication or any manner of treatment. It is clear from the

medical record that Blaise received prompt and adequate medical treatment every time he

presented to the medical department.  There is not a single instance where he was denied

treatment.

Blaise specifically disputes the decision to treat his ACL injury without surgery. The

Third Circuit has stated that " '[w]here a prisoner has received some medical attention and

the dispute is over the adequacy of the treatment, federal courts are generally reluctant to

second guess medical judgment and to constitutionalize claims which sound in state tort

law'." United States ex rel. Walker v. Fayette County, 599 F.2d 573, 575 n. 2 (3d Cir.1979)

(quoting Westlake v. Lucas, 537 F.2d 857, 860 n. 5 (6th Cir.1976)).  Significantly, URC

members Dunbar, Holloway, Sullivan, Horeis, Kaiser, Tucker Vander Hey-Wright,

DeRoberto and Cook did not make the decision to deny the surgery request.  (Doc. 55, ¶ 64).

Rather, they recommended that the request be forwarded to the Regional Medical Director

13

for review.  (<u>Id.</u>)  The Regional Medical Director disapproved Mr. Blaise's request because it did not meet BOP ACL criteria.  (<u>Id.</u> at ¶ 68).  It was specifically noted that "not all chronic ACL tears require repair," and the "[m]edical record reveals lack of pertinent exam findings," which indicated that the ACL injury was not acute.  (<u>Id.</u>)  This course of treatment is grounded in professional medical judgment and is based on an evaluation of Blaise's injury and review of medical records and circumstances.  And, the chosen treatment is fully supported by the applicable BOP Program Statements and policies.

Even if Blaise established, for purposes of summary judgment, that there are other acceptable ways to treat his ACL injury, <u>see</u> <u>White</u>, 897 F.2d at 110, this still falls short in that he fails to come forward with evidence that any of the defendants possessed the requisite mental intent to pursue an Eighth Amendment claim.  <u>See</u> <u>Farmer</u>, 511 U.S. at 825; <u>Durmer</u>, 991 F.2d at 69, n. 13 (stating that a plaintiff must demonstrate a genuine issue of material fact regarding the requisite mental intent to overcome summary judgment).  At most, he may present sufficient evidence to sustain a claim for medical malpractice.

Additionally, supervisory officials such as Warden Ebbert, can only be held liable for civil rights violation if they are shown to "have personal involvement in the alleged wrong." <u>Sutton v. Rasheed</u>, 323 F.3d 236, 249 (3d Cir. 2003) (quoting <u>Rode v. Dellarciprete</u>, 845 F.2d 1195, 1207 (3d Cir.1988)).  The personal involvement of a supervisory official is established either by "allegations of personal direction or of actual knowledge and acquiescence" to the violation of subservient officials.  <u>Rode</u>, 845 F.2d at 1207.  There is simply no evidence in the record demonstrating that defendant Ebbert had any personal

14

involvement in the alleged unconstitutional conduct.

Consequently, defendants are entitled to judgment as a matter of law.

V.      **Conclusion**

For the reasons articulated herein, defendants' motion (Doc. 54) for summary

judgment will be granted.

An appropriate Order will issue.


**BY THE COURT:**


**s/James M. Munley**
**JUDGE JAMES M. MUNLEY**
**United States District Court**


Dated:       March 26, 2015